UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JOEL C. PORTER,

                    Plaintiff,                  Case No. 3:14-cv-00041-JWD-RLB

v.

JOHN DAUTHIER,

                Defendant.

**ORDER AND RULING ON**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.      INTRODUCTION**

On March 7, 2014, the one-page search warrant that spawned the present case ("Warrant") issued. Mr. John Dauthier ("Defendant" or "Dauthier"), a detective with the Cold Case Division of the Baton Rouge Police Department ("BRPD"), got the Warrant; Mr. Joel Porter ("Plaintiff" or "Porter") was its target. The Warrant compelled Plaintiff to submit to a buccal swab for his DNA.[1] In the affidavit supporting the Warrant ("Affidavit"), Defendant professed a reason—to gather a reference sample that would allow BRPD to exclude Plaintiff as a suspect in the newly revived investigation of the murder of Mrs. Denise Washington Porter

---

[1] DNA stands for Deoxyribonucleic Acid.

("Denise"), Plaintiff's wife, in March 1985—and denied any "intention to conceal the fact that Joel Porter was always a suspect in his wife's murder." Plaintiff objected, and a case ensued.

Now, in the filing before the Court—Plaintiff's Motion for Partial Summary Judgement ("Partial MSJ"), (Doc. 124), countered by Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendant's Opposition"), (Doc. 131), itself disputed by Plaintiff's two (seemingly) substantively identical Memorandum in Reply to Opposition to Summary Judgment Opposition ("Plaintiff's Reply"), (Doc. 134, 135)—Plaintiff asks this Court to find no genuine dispute exists under Federal Rule of Civil Procedure 56[2] regarding his complaint's core contention: that impermissible illegality tainted the Warrant entire, its obtainment and execution by Defendant a violation of the Due Process Clause of the United States Constitution's Fourth Amendment, for which Plaintiff is owed redress pursuant to 42 U.S.C. § 1983.[3]

Plaintiff's reasons number two. First, the Affidavit, he contends, was not supported by probable cause because Defendant did not show a sufficient nexus between the item to be seized—Plaintiff's DNA—and the crime investigated—Denise's murder. Second, the Affidavit left out at least twenty-six known and exculpatory facts, omissions which deprived the Warrant of every ounce of legal validity. Defendant contests these twin assertions. He insists that the DNA of the one other person who lived in the apartment where the crime was committed and who found Denise's body in 1985—Plaintiff—could be used either to exclude him as a suspect or, by allowing BRPD to ascertain the absence of any other person's DNA, discount the probability of another's involvement. Defendant thereupon dismisses Plaintiff's list of exculpatory facts as legal arguments or irrelevant minutiae.

---

[2] In this opinion, any and all reference to "Rule" or "Rules" is to the Federal Rules of Civil Procedure unless otherwise noted.

[3] In this opinion, any reference to "Section 1983" or "§ 1983" is to this provision of the United States Code.

Barred from weighing credibility under Rule 56, this Court finds summary judgment improper under Rule 56 for two reasons. Primarily, considered overall, Plaintiff has failed to demonstrate an absence of material issues of fact and inferences drawn from facts regarding whether a nexus existed between the need for Plaintiff's DNA and the investigation of the murder, particularly the investigation of the crime scene, therefore arguably complying with the Fourth Amendment to the United States Constitution. This claimed nexus is oft-used and oft-invoked in this nation's courts, and it is presently impossible to conclude that it reflected mere subterfuge as a matter of both incontrovertible fact and well-defined law. Meanwhile, for the Affidavit's failure to include Plaintiff's twenty-five exculpatory facts to result in Plaintiff's victory at this early stage, this Court would need to find that no "fact" is subject to a genuine dispute over its truth, exculpatory character, and relevance. Yet, more than a handful resemble legal conclusions bereft of an irrefutable factual patina; more than a handful are irrelevant to the Warrant's foundation; and none can be regarded as indisputably true at the time when Defendant first drafted the Affidavit. Accordingly, for these reasons, as more fully explicated below, this Court DENIES Plaintiff's MSJ.


**II.**      **FACTUAL AND PROCEDURAL BACKGROUND**

**A.**      **First Investigation**

On March 14, 1985, Plaintiff returned to his unlocked apartment after working the overnight shift at the United States Postal Service. (Doc. 124-1 at 3; Doc. 120 at 2; Doc. 131-1 at 1.) On the night of March 13 or the morning of March 14, Denise had been "brutally" murdered in the couple's shared apartment, located at 2022 Lobdell Boulevard in Baton Rouge, Louisiana. (Doc. 124-1 at 3; *see also* Doc. 1 at 2; Doc. 120 at 2.) After Plaintiff called BRPD, a criminal

investigation commenced. (Doc. 124-1 at 3; Doc. 131-1 at 1.) Plaintiff allegedly "fully cooperated," making "several unannounced visits to the homicide detectives' office to inquire as to the status of the investigation," (Doc. 120 at 2), and BRPD detectives apparently confirmed that Plaintiff "was at work the entire night," the facility "never left," (Doc. 124-1 at 4; *see also* Doc. 120 at 2; Doc. 131-1 at 1). During the investigation, Plaintiff did not seek legal counsel, and "[w]hile the police . . . checked Joel's story out . . . ," Plaintiff "was not advised that he was considered a suspect of any crime arising out of or related to his wife's murder."[4] (Doc. 124-1 at 5.)

"Evidence from the scene showed the killer lingered in the apartment for some time after the murder and cleaned . . . himself, the crime scene and possibly his weapon." (Doc. 124-1 at 4.) Seemingly, "bloody footprints in the kitchen, blood on the cold water faucet, a bloody rag and a scrub brush with what appeared to be bits of flesh adhere to it" littered the apartment. (*Id.*; *see also* Doc. 120 at 2; Doc. 124-3 at 6.) Based on these observations, the BRPD detectives believed "that the killer washed his hands and weapon with some ivory soap in the sink" and "took a shower after the murder." (Doc. 124-1 at 5; *see also* Doc. 124-3 at 6.) At the time, BRPD detectives physically examined Plaintiff, apparently finding "no evidence on his body of the crime." (Doc. 124-1 at 5.) Eventually, the investigation stalled, destined to lie dormant for "[a]lmost three decades." (Doc. 120 at 3; *see also* Doc. 124-1 at 5; Doc. 131-1 at 1–2.)[5]

---

[4] Plaintiff finds support for this contention in two persons' depositions. First, Plaintiff maintains that Defendant himself conceded that "[n]o one" ever "labeled Joel Porter a suspect." (Doc. 124-12 at 24; *see also* Doc. 131-1 at 1–2.) He similarly characterizes the deposition testimony of Mr. Carl Robert Dabadie, Jr., BRPD's chief. (Doc. 135 at 4.)

[5] Plaintiff became a lawyer, initiating, in his words, "a highly controversial federal law suit arising out of the voting district for the Baton Rouge City Court Judges" in 2012. (Doc. 120 at 3.)

**B.**   **Second Investigation and Affidavit**

In 2013, Defendant, a cold case detective,[6] reinitiated Denise's frozen investigation. (Doc. 131-1 at 2.) Purportedly, so as to utilize it for "comparison to possible DNA evidence collected from a crime scene," (Doc. 124-2 at 2), Defendant obtained a warrant for Plaintiff's DNA, (Doc. 124-1 at 8; *see also* Doc. 131-1 at 2). On March 7, 2013, he chose to call Plaintiff to inform him of this warrant's issue rather than ask for a sample before tendering the Affidavit. (Doc. 124-1 at 8; *see also* Doc. 131-1 at 2). The warrant, issued by the Honorable Michael Erwin, of Louisiana's Nineteenth Judicial District Court, was predicated on this one-page document. (Doc. 124-2 at 1.) To show the necessary probable cause, Dauthier propounded the following reasons in the Affidavit:[7]

1. "On March 14, 1985, the Baton Rouge Police began an investigation into the stabbing death (homicide) of a female victim, Denise Porter, which occurred inside of the apartment she shared with her husband."

2. "Detectives noticed that there was no indication of forced entry into the apartment."

3. "Further there was no indication that the perpetrator committed any other crime while inside."

4. "[A] large amount of physical evidence [was] collected," including "latent prints, photography, shoe impressions, clothing, bodily tissue and blood."

---

[6] Plaintiff tells a more sordid story about his pre-suit relationship with Defendant. Soon after Plaintiff filed his lawsuit, Defendant allegedly began a pattern of "harassment and defamation . . . using his official position and acting under color of state law." (Doc. 120 at 3.) Defendant so acted in an attempt "to revive his career, which had been tarnished by his own arrest amid allegations of drug addiction." (*Id.*)

[7] The Affidavit itself contains no numbered paragraphs. This Court numbers them for ease of reference.

5. "These items had previously been examined . . . but the testing was limited to the technology of the day."

6. "During a review of this unsolved homicide, Detectives now believe that a great amount of this evidence, which the Baton Rouge Police Department still holds, should be tested for the presence of DNA," as "[t]hese tests may well be able to provide an investigative path forward."

7. "To perform these tests," however, "the crime lab first requires a reference sample (buccal swab) from all known suspects, *or* other persons who could likely be a contributor of DNA evidence, to the evidence being tested."

8. "[T]here is no intention to conceal the fact that Joel Porter has always been a suspect in his wife's murder."

9. "[A] sample of . . . [Porter's] DNA is *otherwise* required due to the fact that he lived inside the apartment where the evidence was collected."

10. "Having his DNA profile, to compare to any profiles that might otherwise be unknown, is of paramount importance in continuing this investigation and, as stated, is required by the Louisiana State Police crime lab."

11. "Detectives assert that probable cause exists to compel Joel Porter to submit to a buccal swab to Police, for the purpose of furthering the investigation of the murder of Denise Porter, because Joel is a likely contributor of possible DNA evidence already collected inside the apartment that he shared with Denise."

(Doc. 124-2 at 1 (emphasis added) (mistakes in original).)

**C.**     **Parties' Arguments**

*1.*     ***Partial MSJ***

Plaintiff moves for summary judgment pursuant to Rule 56 on counts two ("Falsifying Affidavit to Obtain Search Warrant"), three ("Search [P]ursuant to an Invalid Warrant"), and four ("False Arrest") of the Amended and Superseding Complaint, (Doc. 120 at 16–18).[8] (Doc. 124-1 at 1.) These three counts share a single conclusion of law— the search warrant issued for his DNA was constitutionally defective—itself dependent on the making of two others: first, the Affidavit lacked sufficient evidence to allow a reasonable magistrate to find the requisite probable cause, and second, that Affidavit failed to adduce exculpatory evidence known to and by the applicant. (*Id.*) For these two reasons, Plaintiff contends the Warrant is an "unreasonable search" in violation of the United States Constitution's Fourth Amendment. (*Id.*)

Heavily reliant on one Fifth Circuit case—*Kohler v. Englade*, 470 F.3d 1104 (5th Cir. 2006)—the Partial MSJ repeatedly compares the Affidavit with the sworn statement deemed insufficient in this binding case. In Plaintiff's view, even as the Affidavit claims "that Plaintiff has 'always been a suspect' in his wife's murder, it contains no facts in support of this conclusory . . . statement, nor does it disclose the ample evidence, in possession of the Baton Rouge Police Department, that Joel could not have done the murder." (Doc. 124-1 at 2–3.) Because Defendant "offered no evidence to Judge Erwin suggesting that there was any reason to believe the DNA from the killer could have come from Joel . . . there was no evidence that gave rise to a fair probability that there existed a nexus between Joel's DNA and his wife's murder." (*Id.* at 3.) Based on the "admonitions" promulgated in *Kohler*, the Affidavit was therefore "abjectly and patently deficient as to probable cause for Joel's DNA." (*Id.*)

---

[8] Count I alleges retaliation for filing a lawsuit.

Broadly, Plaintiff argues that Defendant's justifications for the Warrant are without merit. When questioned, Defendant "gave a response at least suggesting that the only expected usefulness of Joel's DNA was that there would likely be some of it at the apartment where he lived with Denise," a statement described as "tantamount to Dauthier admitting the obvious"— that "he never had probable cause in the first place to swear out an affidavit for Joel's DNA." (*Id.* at 9.) Defendant's emails state "that there is no evidence of anyone but Joel and Denise being in the apartment"; since Defendant had no "suspected killer DNA to compare Joel's DNA with," "there was absolutely no basis to obtain DNA from Joel." (*Id.* at 10.) Defendant never provided the judge with "a fact-specific basis for a finding of probable cause" or "a list of exculpatory information obtained from the earlier investigation which clearly ruled Joel out as a suspect." (*Id.* at 10–11.) Though Defendant thereafter cites to Louisiana law, he returns to *Kohler* and this proceeding's dispositive question: "Whether or not Dauthier clearly delineated, in the affidavit in support of the March 7, 2013 warrant, any set of facts which would lead Judge Mike Erwin to believe that there was a nexus between Joel Porter's DNA and the murder of his wife." (*Id.* at 12, 8.)

Sifted, the grounds for Plaintiff's Partial MSJ number two.

First, in Plaintiff's view, Defendant's warrant, as evidenced by the Affidavit, lacked any indicia of probable cause. (*Id.* at 12.) Pointing to the Affidavit, Plaintiff argues that "[D]efendant . . . does not give any factual, legal or evidentiary basis for seeking . . . Porter's DNA." (*Id.* at 13.) Once more citing to state law, "[t]he only stated purpose for seeking the DNA compatible with Art. 161," Plaintiff maintains, "is' to compare with possible DNA' evidence from the crime scene.'" (*Id.*) This lone reason, however, does not amount to a "fact-specific basis for why Joel's DNA is needed," indicative of an absence of probable cause, for "Denise was killed when Joel

was at work, and Joel's presence at work was verified at the time of the murder." (*Id.* at 13–14.) To Plaintiff, nothing in the Affidavit could lead a reasonable magistrate "to believe that the DNA to be seized from Joel would establish any evidence constituting a nexus between Joel's DNA and the murder of his wife." (*Id.* at 14.) Plaintiff adds that Defendant's desire to "establish a profile to compare to any profiles that might otherwise be unknown" shows that the evidence sought to be obtained, i.e. Plaintiff's DNA, was "for purposes other than that of establishing a specific nexus between Joel's DNA and the murder of Joel's wife," in violation of the Fourth Amendment. (*Id.* at 15.)

Throughout the MSJ, Plaintiff focuses much attention on the Affidavit's statement that "Joel Porter has always been a suspect in his wife's murder," a "bald assertion" devoid of "any evidence or factual basis." (*Id.*) Plaintiff argues that this statement is particularly troublesome for its "apparent[]" purpose: "to circumvent . . . [Defendant's] obligation of making a fact-specific showing of probable cause by urging Judge Erwin to effectively take judicial notice of the aforementioned assertion, while, at the same time, (rather oddly) excluding it as a relevant consideration to be undertaken by Judge Erwin in his application for the search warrant." (*Id.*)

Next, Plaintiff charges Defendant with failing to include a "superabundance of exculpatory evidence" in the Affidavit. (*Id.* at 16.) By his count, these exculpatory "facts" total twenty-five (25): (1) "the killer left a bloody hand print on the body of Denise that did not match Joel Porter's hand print"; (2) "there were bloody shoe prints . . . that did not match or belong to Joel Porter"; (3) "there were unidentified latent finger prints left at the crime scene"; (4) "numerous witnesses stated that Joel Power was at work at the time of the murder"; (5) "Denise Porter was alive when Joel left for work until at least 1:00 a.m."; (6) Joel's work records "indicated not only was Joel at work but that he didn't even take a lunch break on the night of his

wife's murder"; (7) "witnesses placed Joel at work the entire night of the murder of his wife and that these witnesses were corroborated"; (8) "Joel cooperated with investigators without aid of counsel"; (9) "Denise was involved in multiple affairs"; (10) "two of the men" with whom she had an affair "lived at the same apartment complex"; (11) at least one paramour "told homicide detectives that Denise would spend time at these men's apartments when Joel would go to work at night"; (12) these men were "good friends" with the apartment complex's security guard; (13) one of these men lied about his affair with Denise; (14) the security guard friendly with Denise's multiple consorts was in charge that night; (15) one man admitted to speaking with Denise on the phone until around 1:00 a.m. even though the security guard "placed himself at the apartment making rounds between 11:30 p.m. and 12:45 a.m."; (16) a coworker and a supervisor told detectives that "Joel was at work and never left work that night";[9] (17) an unknown man called Denise' parents one week before her murder; (18) Plaintiff had to be sedated and hospitalized on the morning of his wife's death; (19) Plaintiff "was never labeled as a murder suspect by the original detectives on the case"; (20) detectives found "no scars, cuts, scrapes, lacerations, or bruises" on Plaintiff's body in 1985; (21) when the investigation ended in 1985, no forensic evidence of any kind linking Plaintiff to Denise's murder had been found; (22) "no physical evidence of any kind" connected Joel to Denise's murder; (23) "no testimonial evidence of any kind" connected Joel to Denise's murder; (24) no blood was detected in Joel's car, work station, clothes, or shoes; and (25) no murder weapon had been traced to Joel. (*Id.* at 17–20.) Even if this Court does not find the warrant to be facially invalid, Plaintiff contends that such intentional exclusion of exculpatory evidence rendered the warrant materially invalid at inception. (*Id.* at 23.) For that reason too, Plaintiff argues he is entitled to summary judgment on the sole issue

---

[9] Plaintiff divided this "fact" into two, so that his list totaled twenty-six, not twenty-five. (Doc. 124-1 at 19.)

before this Court: the Warrant's unconstitutionality.

## 2.    *Opposition*

Defendant's Opposition begins with a recitation of the case's distant past and a defense of Defendant's "integrity" and "good faith." (Doc. 131-1 at 1, 2.) It then recaps the standard for the issuance of a warrant discussed in Plaintiff's Partial MSJ. (*Id.*)  It concludes: "Defendant has established that at least one genuine issue of material fact exists regarding the claims asserted . . . by Plaintiff." (*Id.* at 11.)

According to Defendant, five weaknesses mar the Partial MSJ. First, some nexus between the items to be seized, i.e. Plaintiff's DNA, and the criminal activity being investigated did exist when Defendant submitted the Affidavit, "if for no other reason than [that] Joel Porter lived [in the] apartment where Denise Porter was murdered." (*Id.* at 5.) Second, the Affidavit includes sundry "relevant facts . . . that would support probable cause for a neutral magistrate." (*Id.*) In particular, the Opposition emphasizes Defendant's need to obtain "reference samples . . . from all known suspects, **or other persons that could be a contributor of DNA evidence**" and the possibility of newer technology producing finer analyses of old evidence. (*Id.* (emphasis in original)) The Affidavit argues that the contribution from Plaintiff was necessary "because Joel is a likely contributor of possible DNA evidence, already collected inside the apartment that he shared with Denise." (*Id.* at 6.) Sufficient to support a warrant, these bare facts are incontestably true, the Opposition maintains, Plaintiff having lived in the apartment, having initially found Denise's body, and having been either a suspect or a person of interest in 1985. (*Id.*) The Affidavit's reference to Porter's status as a "suspect" had no maleficent purpose; it was meant only to "maintain[] transparency in . . . [Defendant's] motives for seeking evidence." (*Id.* at 7.)

Third, because Plaintiff "was a likely contributor to possible DNA evidence collected at the crime scene," Louisiana law was followed, and the Fourth Amendment not offended, by the Warrant. (*Id.* at 7–8.) Fourth, whether or not Defendant intentionally omitted exculpatory information is "a subjective factual issue that must be determined by a fact finder in a court of law." (*Id.* at 8.) For now, Plaintiff's assertions about this evidence's exculpatory character and Defendant's motives are mere "conclusory statements and assumptions . . . based on his interpretation of the partial cold case file"; they are not uncontested facts for purposes of Rule 56. (*Id.*) Finally, because Defendant had no exculpatory evidence "available" to him in March 2014, he could not intentionally omit such pregnant data, (*Id.* at 9), which was "not [yet] . . . determined and . . . still under investigation." (*Id.* at 10.)

### 3.   *Reply*

In this document, filed twice, Plaintiff once more insists that the Warrant "makes only two points": (1) "Mr. Porter has 'always been a suspect'," and (2) "Mr. Porter's DNA can be expected to be present at the crime because he lived there." (Doc. 135 at 2.) Plaintiff attacks this statement as having both "provided Judge Erwin with no information to evaluate whether the warrant should be issued" and falsely implied to any reader that Plaintiff was always a suspect. (*Id.* at 2, 4) He deems the explanation given about the lab's requirements as "bogus," for no evidence of such a scientific need has yet been offered. (*Id.* at 3.) He again stresses Defendant's failure to obtain a voluntary sample, mocking Defendant's apparent belief that Plaintiff may flee. (*Id.*) He ends by reminding the Court of Defendant's failure to hint at the existence of any exculpatory evidence in the Affidavit, his twenty-five "facts" referenced. (*Id.* at 5.) Plaintiff even hazards a guess about the likely effect of this evidence on Judge Erwin: "Presented the warrant

application containing the exculpatory information, Judge Erwin very likely would deny the

warrant and advise Dauthier to go ask Mr. Porter for a DNA sample." (*Id.* at 6.)


**III.   DISCUSSION**

**A.   Rule 56 Standard**

Rule 56 encodes the standard applicable to Defendant's MSJ. Per Rule 56(a), summary

judgment is generally appropriate "if the movant shows there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine"

so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party"; a fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202

(1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (citing *id.*).

Axiomatically, a court construes all facts and evidence in the light most favorable to the

nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). In response to another's

motion, the nonmovant cannot rely on "[c]onclusory allegations, speculation, unsubstantiated

assertions, and legalistic arguments." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754,

759 (5th Cir. 2002). Still, "[w]hen both parties have submitted evidence of contradictory facts,"

*Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to

"draw all reasonable inferences in favor of the nonmoving party" and cannot "make credibility

determinations or weigh the evidence," *Reeves v. Sanderson Plumping Prods.*, 530 U.S. 133,

150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Anderson*, 477 U.S. at 248, 106 S.

Ct. at 2510 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by

the substantive law," materiality "not a criterion for evaluating the evidentiary underpinning of [factual disputes]"). Thus, this Court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1995). In other words, although this Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110, *cited in Havera*, 723 F.3d at 591. Within the narrow ambit of Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510, and (2) so long as the nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**B.**     **Applicable Substantive Law**

Enacted in 1871,  *see, e.g.*, *Tower* v. *Glover*, 467 U.S. 914, 920, 104 S. Ct. 2820, 2824, 81 L. Ed. 2d 758 (1984); Christopher J. Pettit, *The Evolution of Government Liability under Section 1983*, 24 ST. MARY'S L.J. 145, 146–47 (1992), Section 1983 renders "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," liable "to the party injured in an action at law,

suit in equity, or other proper proceeding for redress," 42 U.S.C. § 1983; *Filarsky v. Delia*, 132

S. Ct. 1657, 1661, 182 L. Ed. 2d 662, 668 (2012) ("Section 1983 provides a cause of action

against any person who deprives an individual of federally guaranteed rights under color of state

law." (internal quotation marks omitted)). Accordingly, Section 1983 allows a plaintiff to seek

money damages from state and local officials who have contravened his or her Fourth

Amendment rights.[10] *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 1696, 143 L. Ed. 2d

818 (1999); *see also, e.g.*, *Kohler*, 470 F.3d at 1109–10; *Priester v. Lowndes Cnty.*, 354 F.3d

414, 421 (5th Cir. 2004).[11] Building upon the Court's recognition that "a physical intrusion,

penetrating beneath the skin, infringes an expectation of privacy that society is prepared to

recognize as reasonable," *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616, 109 S. Ct.

1402, 1413, 103 L. Ed. 2d 639 (1989), this Circuit has deemed "the collection of a saliva sample

for DNA analysis . . . [as] a search implicating the Fourth Amendment," *Kohler*, 470 F.3d at

1109 n.4 (collecting cases); *see also Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826,

1835 16 L. Ed. 2d 908 (1966) ("Search warrants are ordinarily required for searches of

dwellings, and, absent an emergency, no less could be required where intrusions into the human

body are concerned."); *cf. State v. Lee*, 976 So. 2d 109, 123–24 (La. 2008) (surveying federal

"jurisprudence" and concluding that "the collection of defendant's DNA constituted a search"

under Louisiana law). Under settled law, "the extraction of evidence by means of buccal

---

[10] While Plaintiff cites to Louisiana state law as to this issue, (Doc. 124-1 at 10; Doc. 135 at 2),
he moved for partial summary judgment on the basis of the Fourth and Fourteenth Amendments
to the United States Constitution, (Doc. 124 at 4). The Constitution's minimums, therefore,
govern here, not Article 161.1 of the Louisiana Code of Civil Procedure.

[11] The Fourth Amendment was long ago incorporated against the fifty states. *Mapp v. Ohio*, 367
U.S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081 (1961) (incorporating the exclusionary
rule as a remedy); *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361, 93 L. Ed. 1782
(1949) (incorporating the right only); *Wilson v. Vill. of Los Lunas*, 572 F. App'x 635, 640 n.5
(10th Cir. 2014) (citing *Mapp*, 367 U.S. 643).

swabbing is a search and seizure within the meaning of the Fourth Amendment." *United States v. Hardrick*, No. 10-202 SECTION: R, 2012 U.S. Dist. LEXIS 125559, at *5–6, 2012 WL 3860464, at *2 (E.D. La. Sept. 5, 2012). The constitutional command is clarion clear: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized," U.S. CONST. amend. IV;[12] *Padgett v. Donald*, 401 F.3d 1273, 1277 (11th Cir. 2005).

To comply with this constitutional stricture, an affidavit supporting the application for a search warrant for a person's DNA "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983); *see also, e.g.*, *United States v. Brown*, 567 F. App'x 272, 282 (5th Cir. 2014) (quoting *id.*); *United States v. Marion*, 547 F. App'x 283, 285 (4th Cir. 2013) (same). Generally, "[p]robable cause exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of a crime." *Kohler*, 470 F.3d at 1109 (relying on *Gates*, 462 U.S. at 238–39); *Fountain v. City of Plano Police Dep't*, No. 4:12-CV-26, 2012 U.S. Dist. LEXIS 186196, at *19–20, 2012 WL 7149510, at *7 (E.D. Tex. Dec. 13, 2012) (citing *id.*). More particularly, when a specific object, whether a scarf or saliva, is sought, the affidavit must make it "apparent . . . that there is some nexus between the items to be seized and the criminal activity being investigated." *Kohler*, 270 F.3d at 1109; *accord Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000). "Assuming no problems exist with respect to time," an affidavit meets the bare minimum if it evidences a reasonable link between (1) the relevant

---

[12] The Fourth Amendment contains two clauses, "one protecting 'persons, houses, papers, and effects, against unreasonable searches and seizures,' the other regulating the issuance of warrants." *Zurcher v. Stanford Daily*, 436 U.S. 547, 577, 98 S. Ct. 1970, 1987, 56 L. Ed. 2d 525 (1978) (Stevens, J., dissenting).

criminal activity, (2) the things to be seized, and (3) the place to be searched. 2 WAYNE R.

LAFAVE, SEARCH & SEIZURE § 3.7(d) (5th ed. 2012-2015). With no more required than a

reasonable connection between the evidence sought and the crime investigated, *see Doe*, 225

F.3d at 451 (finding an affidavit insufficient due to its failure to "identify a single fact that would

suggest to a reasonable person that there was any link whatsoever" between the place to be

searched and the crime committed), a court must apply the Fourth Amendment's requirement of

probable cause "not according to a fixed and rigid formula, but rather in the light of the totality

of the circumstances made known to the magistrate," *Massachusetts v. Upton*, 466 U.S. 727,

728, 104 S. Ct. 2085, 2085, 80 L. Ed. 2d 721 (1984). Logically, therefore, what is later

uncovered or proven true (or untrue) is irrelevant to this analysis and is an improper measure of

probable cause.

A sufficient showing must, "obvious[ly]," be "a *truthful* showing." *Franks v. Delaware*,

438 U.S. 154, 164–65, 98 S. Ct. 2674, 2681, 57 L. Ed. 2d 667 (1978) (emphasis in original)

(quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966)); *see also, e.g.*,

*Winfrey v. San Jacinto Cnty.*, 481 F. App'x 969, 979 (5th Cir. 2012) (quoting *id.*). In this unique

context, "truthful" does not mean "that every fact recited in the warrant affidavit is necessarily

correct, for probable cause may be founded upon hearsay and upon information received from

informants, as well as upon information within the affiant's own knowledge," *Franks*, 438 U.S.

at 165, or gleaned from other officers, *Bennett v. City of Grand Prairie,* 883 F.2d. 400, 407 (5th

Cir. 1989). Instead, in setting forth his or her supporting facts, the affiant must not make

"deliberately or recklessly false statements," *Curtis v. Anthony*, 710 F.3d 587, 597 (5th Cir.

2013) (explaining and applying *Winfrey*, 481 F. App'x at 979), or omit "material" and

"exculpatory" facts, *Kohler*, 470 F.3d at 1113. Consequently, allegations of "negligent

misrepresentation" in the underlying affidavit will not render a warrant constitutionally infirm, *United States v. Astroff,* 578 F.2d 133, 136 (5th Cir. 1978), *cited with approval in Winfrey*, 481 F. App'x at 980; *see also United States v. Williams*, 477 F.3d 554, 557–58 (8th Cir. 2007) (applying the same standard, derived from *Franks*). Equally undoubtedly, the mere "inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it." *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993); *see also United States v. Johnson*, No. 2:14-cr-12, 2014 U.S. Dist. LEXIS 143623, at *13, 2014 WL 5091970, at *5 (N.D. W. Va. Oct. 9, 2014) ("[W]hen inaccurate, improper, or otherwise tainted evidence is used to obtain a search warrant, the warrant will not be invalid so long as there is enough untainted information to support probable cause.").

Based on this case law, ascertainment of the extent to which a search warrant's affidavit lacked probable cause involves a multistep analysis. A court must initially determine whether the affidavit contains any provably false statements and, if not, whether a sufficient and reasonable nexus existed at the time of the warrant's issue between the items to be seized and the crime at issue. If, however, the affidavit appears facially valid but incorporates proven falsities or omits facts that are material, exculpatory, and verifiable, a second duty arises. *See, e.g.*, *Conlan v. King*, No. A-13-CA-169-LY, 2015 U.S. Dist. LEXIS 72896, at *9, 2015 WL 3603688, at *3 (W.D. Tex. June 5, 2015) (citing *Kohler* in a case involving a purportedly false arrest warrant). Then, the court must (1) either extirpate the false information or add the omitted data and (2) then apply the probable cause standard to the truncated or reconstructed affidavit. *See Kohler*, 470 F.3d at 1113–14. If this conjectured document still satisfies the Fourth Amendment's totality test, the warrant it occasioned is constitutionally valid. And even if the affidavit does not meet this elastic and holistic test, the omission or misrepresentation must be reckless for the warrant to

have been originally void. As such, an affidavit marked by negligent misrepresentations will not run afoul of the Fourth Amendment while an affiant's reliance on some "inaccurate" or "improper" evidence will not denude the warrant of its presumptive constitutionality if the untainted facts demonstrate the requisite nexus.

**C.**     **Application**

*1.*     *Threshold Issue: Defendant's Apparent Acquiescence to Plaintiff's Statement of Undisputed Facts*

Prior to a more thorough analysis of the MSJ, this Court resolves an issue raised by Plaintiff's counsel: that Defendant's failure to directly contest the statement of undisputed facts appended to the Partial MSJ, (Doc. 124-10), effectively admitted their veracity, (*see, e.g.*, Doc. 135 at 3 n.8).[13] This argument entirely relies on a local rule, Middle District of Louisiana Local Rule 56. This provision's first paragraph reads: "Every motion for summary judgment shall be accompanied by a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." M.D. LA. LR 56(a). Its second declares: "Each copy of the papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which the opponent contends there exists a genuine issue to be tried." M.D. LA. LR 56(b). It concludes: "All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this Rule." *Id.*

In spite of this command, the Fifth Circuit itself has noted that the failure to follow the precise mandate of this rule is not necessarily fatal to the opposition to a summary judgment

---

[13] At oral argument, he renewed this claim.

motion. *See Smith v. Brenoettsy*, 158 F.3d 908, 910 n.2 (5th Cir. 1998) (discussing this rule's predecessor). Logic explains why, for, as this opinion suggests, other materials may reveal clear opposition to another's factual rendition without pinprick precision. Here, Defendant's multiple filings, most especially his Opposition, leave no doubt about his disagreement with either the basis or import of each of Plaintiff's undisputed facts. Under these circumstances, the Court feels it appropriate to exercise its discretion and "give [Defendant] an opportunity to properly support or address" the Plaintiff's asserted facts, FED. R. CIV. 56(e)(1), by, within forty-eight (48) hours of the issuance of this ruling, filing a pleading which complies with this district's local rule, as reiterated in this opinion's final paragraph, *see infra* Part IV.

2.      *Existence of Genuine Disputes over Affidavit's Alleged Falsities and Omissions*

Here, in part due to the factually intensive nature of any inquiry into an affiant's subjective intent and the totality test engrafted unto the Fourth Amendment, Rule 56 compels a particularly rigorous application of probable cause jurisprudence. For this Court to grant Plaintiff's Partial MSJ pursuant to Rule 56, no genuine dispute could exist regarding four discrete adjudicative facts: (1) the insufficiency of the nexus between Plaintiff's DNA and the investigation of his wife's untimely murder in 1985; (2) the exculpatory and factual character of Plaintiff's twenty-five facts; (3) the recklessness of Defendant's failure to include each so-labeled exculpatory fact; and (4) and that Defendant's statement regarding Plaintiff's  status as a "suspect" was both untrue and recklessly made. If a reasonable factfinder could detect a nexus based on the evidence so far unearthed, the Warrant would be constitutionally valid, and Plaintiff's suit would end unsuccessfully. Similarly, if that same rational person could regard those twenty-five "facts" not as exculpatory evidence but as factual inferences or inapposite

detail, their omission from the Affidavit would not taint the Warrant to such an extent as to render it unconstitutional. And, just as surely, if Defendant's omission of the twenty-five "facts" could be reasonably seen as the product of foolish negligence or careless indifference,[14] the Warrant would not lose its presumption of constitutionality. With its deliberations governed by two old saws—"The movant has the burden of showing that there is *no* genuine issue of [material] fact," an issue defined as "genuine" if "real and substantial," *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (alteration in original) (construing Rule 56(c) and quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510), and "the summary judgment record/evidence is viewed in the light most favorable to the nonmovant, with all factual inferences made in the . . . [latter's] favor," *Estate of Henson v. Callahan*, 440 F. App'x 352, 355 (5th Cir. 2011) (quoting *id.*)—this Court concludes that Plaintiff has not met his burden of showing the absence of a genuine dispute over these complex, fact-intensive issues.

### (a)    Warrant's Sufficient Nexus

In Plaintiff's eyes, as bases for probable cause, the Affidavit "makes only two points: 1) that Mr. Porter has 'always been a suspect' and 2) that Mr. Porter's DNA can be expected to be present at the crime scene because he lived there." (Doc. 135 at 2; *see also* Doc. 124-1 at 14–15.) The first point is recurrently criticized as "a bald assertion" for which Defendant "provid[ed] . . . [no] evidence or factual basis whatsoever in support." (Doc. 124-1 at 15; *see also* Doc. 135 at 2 ("Dauthier does not even try to defend that 'always been a suspect' statement . . . in his opposition to the instant motion.") He damns the second point as insufficient to "give[] rise to a fair probability that Plaintiff . . . is the individual who left any DNA connected with the crime or

---

[14] In other words, the Constitution is not simply violated by an officer's ethical lapses. A darker impulse, proven by clear fact, is demanded.

that there exists a nexus between Joel Porter's DNA and Denise Porter's murder." (Doc. 124-1 at 14; *see also* Doc. 135 at 2–3.)

Reviewing the Affidavit entire, this Court cannot agree that the finding of a sufficient nexus is a factual impossibility. Again and again, Plaintiff characterizes Defendant's purpose—to obtain a reference sample from the crime scene's only other regular denizen—as "bogus" and as an attempt "to sidestep the insufficiency of his warrant application's showing that there was probable cause to believe Mr. Porter had any connection to the crime beyond being related to the victim." (Doc. 135 at 3.) Yet, with Rule 56 compelling this Court to view all but the uncontroverted facts in the nonmovant's favor, the Affidavit does adduce enough facts to link the items to be seized, i.e. Porter's DNA, with the crime being investigated, i.e. Denise's murder, for an eminently logical reason, i.e. to exclude him as a suspect or to exclude anyone else. As Plaintiff himself concedes, he and Denise lived together in the very apartment where she was found murdered, (*id.* at 3), and the absence of any other DNA but his own (and Denise's), a fact that could only be confirmed after his DNA's analysis, could reasonably serve this obvious purpose. In fact, as the only other regular resident of an apartment in which a bloody murder transpired and in which "no indication of forced entry" could be detected, the only man known to have seen Denise's body before BRPD's arrival, (Doc. 124-2 at 1), Plaintiff is no random bystander to this particular incident, and he is clearly not a person arbitrarily selected without cause from amongst a pool of thousands without any unique association with a particular crime's setting. Rather, he is one of the few people with an apparent and reasonable link to the victim, the crime, and the scene, facts recapped in bare detail in the Affidavit. Considered *in toto* and in the nonmovant's favor, then, the Affidavit's facts could be read as establishing a reasonable nexus between the crime  scene at issue—the deceased's apartment—and the person to be

searched, both her husband and her cotenant—the Plaintiff.  Based on these circumstances'

totality, the traditional deference owed to a magistrate judge's determination, *United States v.*

*Perez*, 484 F.3d 735, 740 (5th Cir. 2007) (relying on *United States v. Brown*, 941 F.2d 1300,

1302 (5th Cir. 1991)),[15] and the crucial fact "that a search warrant, unlike an arrest warrant, may

issue, without the slightest clue to the identity of the criminal," *Jones v. United States*, 14 F.

Supp. 3d 811, 818 (W.D. Tex. 2014) (quoting *United States v. Webster*, 750 F.2d 307, 318 (5th

Cir. 1984)), serves to strengthens the Warrant's apparent probable cause.

      In fact, search warrants for DNA predicated on that matter's intended use as a reference

sample commonly issue. More particularly, when a person's DNA is likely to be present at the

scene of a crime, probable cause has been often found on the basis of investigator's purported

need to exclude either one person as a suspect or others as probable suspects. *See, e.g.*, *United*

*States v. Andrews*, No. 1:12CR100-1, 2014 U.S. Dist. LEXIS 53320, at *7–9, 2014 WL

1516188, at *3 (N.D. W. Va. Apr. 17, 2014); *People v. Negron*, 284 N.E.2d 491, 505 (Ill. Ct.

App. 2013).  For that matter, "[a] national survey of forensic crime laboratories reported that

DNA testing was used to exclude suspects in about 20-25% of its cases." *Cherrix v. Braxton*, 131

F. Supp. 2d 756, 767 (E.D. Va. 2001). As reason suggests, a person's DNA can often prove

crucial, as knowledge of that hereditary blueprint may prove highly probative of the perpetrator's

identity, allowing police to focus on either the possessor of the scene's foreign DNA or on the

one actor whose DNA verifiably litters the scene. Per Defendant's own testimony, testimony that

this Court is not entitled to disbelieve and the jury is entitled to consider, this widely-recognized

purpose, regularly sufficient to establish probable cause, animated him: "We've been unable to

rule him [Plaintiff] out. No one wanted to do that more than me." (Doc. 124-9 at 14.)

---

[15] Notably, *Perez* postdates *Kohler*.

Plaintiff, however, argues that "[i]f Mr. Porter's DNA is expected to be found at a location from normal legal activity then the fact that his DNA is found there is not going to prove anything." (Doc. 135 at 3.) As a matter of logic, this statement is incorrect, for if Plaintiff's DNA is the only other biological material in that apartment, it would tend to prove no other person was likely present within the apartment at the time of Denise's death. (Doc. 135 at 3.)  At another point, Plaintiff says that the Affidavit gave Judge Erwin no reason to believe the killer's DNA came from Joel, (Doc. 124-1 at 3), but the Affidavit did not seek Plaintiff's DNA for that reason, (Doc. 124-2 at 1). Instead, Defendant relied on a cause oft-invoked for purposes of showing a DNA search warrant's probable cause, and this Court, bound by Rule 56, cannot just disregard this reason's apparent validity because Plaintiff disbelieves it or some suspicion dogs it. Similarly, Plaintiff also claims that by predicating the Warrant on his need for a reference sample from Plaintiff, the apartment's other regular inhabitant in March 1985, Defendant "admitt[ed] the obvious": "he never had probable cause in the first place." (Doc. 124-1 at 9.) Yet, the need for a reference sample from a crime scene's regular denizen—and the alleged discoverer of a murder victim's corpse—easily supports a finding of probable cause; Plaintiff's reading is far from "obvious." It is likewise irrelevant to the Warrant's probable cause analysis at this stage that Plaintiff was not asked for his DNA or that Dauthier did (or did not) have good reason to believe Plaintiff might flee. (Doc. 135 at 3.) As long as the totality of the circumstances evidenced a sufficient nexus, the Affidavit and hence the Warrant would not run afoul of the Fourth Amendment.

This conclusion—that the evidence, weighted in the nonmovant's favor, can support a finding of probable cause—follows even if one disregards the Affidavit's ambiguous reference to Plaintiff's status as a "suspect." Naturally (and understandably), Plaintiff damns this assertion,

asserting that its proven falsity irreparably contaminates the Warrant, and cites to the deposition testimony of Defendant and Mr. Carl Robert Dabadie, Jr. ("Dabadie"), BRPD's chief of police, for proof that no one ever considered him an official suspect. (Doc. 124-1 at 14, 15; Doc. 135 at 2, 4.) In placing so much emphasis on this single clause in a four-paragraph affidavit, Plaintiff ignores black-letter law in two ways.

First, if a false statement's deletion does not denude an affidavit of its probable cause, its inclusion cannot render a warrant constitutionally defective. *Wright*, 991 F.2d at 1186; *see also Johnson v. Norcross*, 565 F. App'x 287, 289 (5th Cir. 2014). As this Court has already found in construing the evidence in the manner prescribed by Rule 56, a nexus between Plaintiff and the investigation of the crime sufficient for a finding of probable cause can be reasonably posited regardless of whether or not this particularly offensive statement is tallied. Consequently, at least for now, the statement's arguable falsity is irrelevant.

Second, not every fact stated in an affidavit must be "necessarily correct" for an affidavit to satisfy the constitutional minimum; oftentimes, "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge." *Franks*, 438 U.S. at 165. For now, the statement's basis—and hence its certain falsity—remains unclear, and the deposition testimony upon which Plaintiff relies in insisting on its obvious spuriousness does not attest to its inherent spuriousness. True, Dabadie testified that, beyond one article summarizing the Affidavit's contentions, he was not "aware of any person who has ever since 1984 through 2012 . . . accused or stated that Mr. Porter was a suspect in a murder." (Doc. 124-11 at 3.) But, as he subsequently made clear, his familiarity with the case itself was negligible: "I'm not aware of any documents [that exist that suggests that Mr. Porter was ever a suspect]. I haven't read any case files or anything along those lines." (*Id.*) At least

based on the excerpts provided to the Court, Defendant also offered up ambiguity during his testimony. When asked, "You didn't put in the warrant that there was no document indicating that Joel Porter was a suspect, did you, sir?" he actually refused to answer, (Doc. 124-12 at 9), and acknowledged his statement's roots in other officers' hearsay, (Doc. 124-9 at 10, 11, 13), as the law allows, *Franks*, 438 U.S. at 165.  Based on such evidence, it is thus possible that the statement when made reflected Defendant's belief, founded on hearsay and his own knowledge, in Plaintiff's status as a suspect. Had he testified that he knowingly advanced that claim without a reason, its falsity would be established for purposes of this motion, but no evidence has been presented that renders that conclusion unavoidable. Instead, only ambiguous testimony and Plaintiff's own belief has been proffered, with Defendant's Opposition contending the opposite: "Porter was never eliminated as a suspect or a person of interest in the 1985 investigation," (Doc. 131-1 at 7). While Plaintiff may be rightly offended at the statement's implications, in the absence of incontrovertible evidence of its inaccuracy, its inclusion cannot support his argument for summary judgment.

### (b)  Inappositeness of *Kohler*

Upon one case—*Kohler*—Plaintiff places great weight. (Doc. 124-1 at 1–3.) Relying on *Kohler*, he writes, "it is facially apparent that the Dauthier[] affidavit in support of the seizure warrant was abjectly and facially deficient as to probable cause for Joel's DNA." (*Id.* at 3.) The *Kohler* opinion "set forth some very clear, precise and strong admonitions regarding an officer's duty to make apparent, within his supporting affidavit for a search warrant, the nexus between the *items to be seized* and the *criminal activity under investigation*." (*Id.* (emphasis in original).) To him, *Kohler* has special relevance, as it too concerned misconduct by the BRPD, its

"admonitions . . . unheeded to this day, as clearly evidenced by the facts of the instant case." (*Id.*)

In light of this insistence, the facts in *Kohler* merit a brief summary. In *Kohler*, the investigation began with an FBI-produced profile for a Baton Rouge serial killer and a task force tip line for the public call, and evidence from a crime scene included the murderer's DNA and approximate shoe size. *Kohler*, 470 F.3d at 1106–07. From over 5,000 calls to the tip line, the task force contacted more than 600 men in "an effort to collect oral saliva swabs for DNA comparison" and received two anonymous tips that Kohler was "a possible person who needed to be checked." *Id.* at 1107. Detectives also "learned that Kohler had been convicted of burglary in 1982" and, though "currently unemployed, "was last employed as a welder for a fabrication company headquartered on Old Perkins Road with a secondary shop on Choctaw Drive--the Baton Rouge road where investigators had discovered a cell phone taken from one of the victims." *Id.* at 1107. In addition, "Kohler had worked for another company located off Choctaw Drive 10 or 11 years earlier." *Id.* Eventually, detectives obtained a search warrant for Kohler's DNA based on an affidavit which included the following information: (1) Kohler was one of fifteen men out of 600 who refused to give a DNA sample; (2) two anonymous and uncorroborated tips had identified him as a possible suspect; (3) Kohler's (distant) past employment for a company that had a shop on the same road where a victim's cell phone was found; (4) Kohler's unemployment at the time of the investigation; and (5) Kohler's twenty-year-old burglary conviction. *Id.* at 1109–11; Charles F. Baird & Abigail Gilsan, *Fifth Circuit Survey: Fourth Amendment*, 40 Tᴇx. Tᴇᴄʜ. L. Rᴇv. 607, 612–13 (2008).

The *Kohler* court found the resulting affidavit to be constitutionally deficient, resting its conclusion on the officers' failure to corroborate those anonymous tips and reliance on two "generalized" traits—"employment in a job that required physical strength and financial

insecurity due to unemployment"—"that hundreds, if not thousands, of men in the Baton Rouge

area could have possessed." *Kohler*, 470 F.3d at 1111–12.  "[F]ar more specific evidence linking

the suspect to the crime being investigated" would have been sufficient, as would have been

previous arrests or convictions "involv[ing] . . . crime[s] of the same general nature as the one

the warrant is seeking to uncover." *Id.* at 1111. *Kohler*, then, prohibits a finding of probable

cause when officers rely on anonymous tips and offer no indication in the affidavit as to the

tipster's credibility or basis for the tipster's information and no independent corroboration of the

tips. *See United States v. Brown*, 567 F. App'x 272, 283 (5th Cir. 2014) (thusly describing

*Kohler*'s holding); *cf. Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 433

(5th Cir. 2008) (citing *Kohler* but noting that "anonymous tips that have been independently

corroborated by government officials may provide sufficient grounds to seize a child").

     Correctly read, *Kohler* bears little resemblance to the case at hand. In *Kohler*, anonymous

and uncorroborated tips, the suspect's unrelated employment history, and his tangential, aged

links to the crime scene constituted the affidavit's whole universe of presented facts. *Kohler*, 470

F.3d at 1111–12.  The connection between Plaintiff and Denise's murder scene, on the other

hand, is far more substantial. No proof indicated that Kohler lived or knew a single victim; his

wife's husband, Porter self-evidently did. Kohler had worked for a company located on the same

street where a victim's cell was found more than a decade before the relevant murder; Porter

long called the crime scene "home"  and remains, decades later, the one person known to have

been within it prior to BRPD's arrival. Probable cause to search Kohler was partly founded on

his financial insecurity and his physical strength, generalized and common traits; probable cause

here was based in part on Porter's married habitation with Denise, a far less universally shared

circumstance. Uncorroborated and anonymous tips fingered Kohler as a person of interest out of

hundreds; no such unverifiable innuendos were necessary to link Plaintiff to either Denise or the crime scene. In sum, however unjustified the Warrant may be later adjudged, "far more specific evidence linking the suspect to the crime being investigated" than the magistrate judge possessed in *Kohler* is present here. *Id.* at 1111.

(c)     **Existence of Disputes over Plaintiff's List of "Exculpatory Facts"**

As Plaintiff correctly notes, (Doc. 135 at 7), the reckless decision to exclude exculpatory facts from a search warrant "may" rise to a constitutional violation, *Kohler*, 470 F.3d at 1113. In the MSJ, Plaintiffs identified twenty-six "facts" he describes as "exculpatory" and "material." (Doc. 124-1 at 17–20.) This Court, however, cannot agree that no genuine dispute exists as to the materiality and exculpatory quality of these purported facts for two reasons.

First, not one fact has any indisputable bearing on this particular Affidavit's showing of probable cause. Taking its statements as true, Defendant sought Plaintiff's DNA so as to identify what foreign DNA, if any, was present in a murder victim's apartment. (Doc. 124-2 at 1.) Plaintiff's DNA was targeted for the simple reason that, as a former inhabitant of that apartment right up to Denise's demise, his DNA could be expected to be present. In light of that probability, his DNA was necessary, for without such an analysis, it would be literally impossible for any investigator to compile a full list of suspects based on the non-victim DNA sprinkled throughout her once bloodied home. Every "fact" compiled by Plaintiff—witness testimony indicating that he spent his every hour at work on the night of March 14, 1985; Denise's multiple affairs with other tenants, some of whom befriended the building's security guard; and more, *see supra* Part II.C.1—would not necessarily invalidate this underlying justification and the probable cause that it engenders. While they, at best, hint at an expanded

pool of suspects and persons of interest, not one utterly negates the validity of the reasons offered for the Warrant in the Affidavit: BRPD's need for a reference sample from the only known individual to have seen Denise's body before the investigation began and to have regularly occupied the place she—and he—called home. Precisely because this Court is not permitted to adjudge Defendant's credibility under Rule 56, a genuine dispute thus beclouds a critical issue: whether these "facts" truly mattered to the Warrant's constitutionality.

Second, as Defendant contends, genuine disputes exist as to whether Plaintiff's "facts," whether individually or cumulatively considered, were sufficiently material, exculpatory, and factual to be included in the Affidavit.   Some may be reasonably seen as irrelevant. At least six arguably imply other suspects should be considered but do not simultaneously tend to disprove the possibility of Plaintiff's participation. Several others are unverifiable due in part to Denise's unascertained time of death, including, "Joel Porter was at work at the time of the murder," and, "Denise was alive when Joel left for work."  Others appear to be extrapolations and interpretations of the cold case file subject to debate, including whether the discovered hand, show, and latent finger prints were Plaintiff's own. Whether Plaintiff was ever a suspect, of course, has been hotly contested by both Parties, with Defendant having so testified on May 14, 2014, (Doc. 124-9 at 10–11). In light of the questionable relevance of Plaintiff's twenty-five "exculpatory facts," each directly or indirectly contested by Defendant, Rule 56 bars this Court from finding the Affidavit deficient for Defendant's failure to include this unclassifiable agglomeration. Only a true factfinder—a jury some day soon—can scrutinize the Parties' contentions and judge the cogency of Defendant's defense: "I don't believe that there was any exculpatory information in the search warrant, nor was there any available to me." (Doc. 124-12 at 5.)

## IV.     CONCLUSION

In accordance with Rule 56, courts must isolate and dispose of factually unsupported claims or defenses, thereby helping to ensure the speedy, efficient, and just adjudication of every action, and resolve all reasonable doubts in favor of the party opposing summary judgment. Having considered Plaintiff's MSJ, Defendant's Opposition, and Plaintiff's Reply, this Court cannot conclude that no genuine dispute, with both sides reasonably armed, remains over the constitutional sufficiency of the Affidavit and the rightful significance of the information excluded. For now, the Affidavit can be reasonably said to raise jury issues as to the requisite nexus between the crime committed and the objects to be seized, compliant with the law's bare minimum as construed in, among others, *Kohler*. For now, questions worthy of a jury's consideration cling to Plaintiff's every exculpatory fact, conclusions and inferences intermingled with assertions of only doubtful validity to the issue at hand. Accordingly, for the foregoing reasons, this Court DENIES the MSJ.

Additionally, within **forty-eight (48) hours** of this order's docketing, Defendant is ordered to provide a point-by-point refutation of each of Plaintiff's "exculpatory facts." The response must be detailed and, if possible, supported by citations to the existing record; no new evidence may, therefore, be utilized. Failure to comply with this requirement may result in the prompt imposition of any sanctions authorized by the Rules.

Signed in Baton Rouge, Louisiana, on September 23, 2015.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**